**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANA ARENAS, <br><br> Plaintiff, <br><br> v. <br><br> L'OREAL USA PRODUCTS, INC., <br><br> Defendant. | Civ. No. 10-0808 (DRD) <br><br> **O P I N I O N** |

*Appearances by:*

Zatuchni & Associates, LLC
by: David Zatuchni, Esq.
    Rimma Rahzba, Esq.
287 South Main Street
Lambertville, NJ 08530

   *Attorneys for Plaintiff,*

K&L Gates, LLP
by: Christopher Carton, Esq.
    Laura Stutz, Esq.
One Newark Center, Tenth Floor
Newark, NJ 07102
   *Attorneys for Defendant.*

**DEBEVOISE, Senior District Judge**

This case arises out the termination of Plaintiff Ana Arenas' employment with Defendant L'Oreal USA Products, Inc. ("L'Oreal"). On September 28, 2009, Ms. Arenas filed a Complaint in New Jersey Superior Court, Middlesex County, which was removed to this Court on February

17, 2010. The Complaint alleged that her termination was motivated by age discrimination in violation of the New Jersey Law Against Discrimination ("NJLAD") N.J.S.A. 10:5-1 *et. seq.*, and sought compensatory and punitive damages. On August 8, 2010, Ms. Arenas filed an Amended Complaint to add certain factual allegations in support of her claim.

On January 20, 2011, L'Oreal moved for summary judgment against Ms. Arenas' claim. For the reasons set forth below, L'Oreal's motion is granted. While Ms. Arenas successfully made a prima facie case of age discrimination, she failed to produce any evidence that could tend to establish that the legitimate, non-discriminatory reason offered by L'Oreal for her termination was pretextual.

## I.   BACKGROUND

L'Oreal, the cosmetics and beauty giant, operates a production facility in Piscataway, New Jersey (the "Facility"). In 2008, L'Oreal sought to reduce the Facility's workforce due to a decline in production. In order to avoid layoffs, in November 2008, the company offered a voluntary early retirement package (the "VERP") to all packaging operators age fifty-five and over that had been employed at the Facility for five or more years. As a sixty year old packaging operator that had been with L'Oreal for nearly thirty years, Ms. Arenas was eligible to receive the VERP. However, she decided against it.

Ms. Arenas worked in the Facility as a packaging operator from October 1980 until March 26, 2009 when she was fired in accordance with the Piscataway Manufacturing Discipline Policy (the "Discipline Policy"). The policy lists a host of "Occurrence[s]" that can result in the issuing of points, including, among others, tardiness, absences, low productivity, dress code violations, and most relevant to this ruling, quality errors. (Certification of David Zatuchni, Esq., dated February 21, 2011 ("Zatuchni Cert."), Ex. J.) Under the policy, an employee receives two

points for the first quality error, four points for the second error, and six points for the third error and those subsequent to it. (Id.). Garnering eighteen or more points is grounds for termination. However, points expire twelve months from the date they are issued.

The production workforce at the Facility is unionized under Local 262 of New Jersey R.W.D.S.U.—U.F.C.W. ("Local 262") and has entered into a collective bargaining agreement with L'Oreal. Under that agreement, facility employees may only be terminated for cause. The agreement also allows an employee to file a grievance related to any disciplinary action taken by L'Oreal, including termination, if the union is not satisfied with the company's reasons for the action.

As a machine operator, Ms. Arenas' responsibilities included setting up and running the packaging lines and performing hourly quality checks on the product units produced at the Facility. Over the course of the twelve month period leading up to her termination, Ms. Arenas accumulated the following twenty-six quality error points for failing to perform her required hourly quality checks: (1) two points on April 3, 2008 for 16,000 mislabeled units; (2) four points on June 13, 2008 for 34,734 quality rejected units; (3) six points on January 29, 2009 for an unknown number of mislabeled units; (4) six points on March 19, 2009 for 5,148 mislabeled units; and (5) six points on March 19, 2009 for 5,911 mislabeled units. (Zatuchni Cert., Ex. L.) She received written notice of each instance where points were issued to her and the reasons why they were issued. See (id.). In addition, she received written warnings on December 9, 2008 and January 26, 2009 indicating the total number of points she accumulated as of each date and reminding her that eighteen or more points may result in her termination. See (id.).

She did not challenge, grieve, or otherwise complain about the assessment of quality error points against her at the time they were issued or when she was terminated. Instead, she

filed a grievance with Local 262 complaining that her termination was unjustified because her co-workers did not receive similar quality error points for the mislabeled units on March 19, 2009. Local 262 investigated the grievance and discovered that her co-workers were, in fact, issued points for those units. It decided not to pursue arbitration.

The parties dispute whether issuing quality error points is mandatory. However, the testimony of Sergio Gil and Keith Reed, both of whom were supervisors at the Facility during Ms. Arenas' tenure, make clear that issuing points for quality errors is mandatory except those that are caught by the employee within an hour because they are easily fixable. See (Zatuchni Cert., Ex. C, D.) Specifically, Mr. Gil testified to the following:

> Q. Earlier when you described certain errors . . . would they normally—if you were written up for those kinds of errors would you receive points?
>
> ***
>
> A. [A]s soon as you left your shift, if you—you should have done your hourly checks. Let's say you ran 6 hours with an error you should have caught, then you would be, you know issued points. Do you understand?
>
> Q. Yes.
>
> A. If you would have ran one hour, then no. If you were doing your hourly check and you caught it within an hour, then okay, let's go rework the products.

(Zatuchni Cert., Ex. C.)

Mr. Reed confirmed Mr. Gil's testimony:

> Q. You were just asked about checking—the operator checking at the beginning of the shift, and my understanding is then they have to check after an hour again, right?
>
> A. Correct.
>
> ***
>
> Q. . . . [L]et's say you mentioned at one point that 2,500 pieces could be produced in an hour. So let's say in an hour it was determined by the operator that let's say

4

> 2,000 pieces were produced incorrectly, so at that point the operator caught the error; is that right?
>
> A. Correct.
>
> Q. So at that point could the operator then not be issued any points or a write-up because that operator let's say caught the error?
>
> A. It's possible. Yes.

(Zatuchni Cert., Ex. D.)

The parties also dispute whether garnering eighteen or more points in a twelve months period results in automatic termination. However, the record is clear that it does not. The Discipline Policy states that "[t]he accumulation of 18 [or more] points [within a twelve month period] is grounds for termination. However, [L'Oreal] reserves the right to evaluate each employee's work record in reaching a final decision on termination." (Zatuchni Cert., Ex. J.) A reading of these two sentences together clearly suggests that L'Oreal has the discretion to investigate the circumstances surrounding an employee's accumulation of eighteen or more points and take those circumstances into account in deciding whether or not to terminate that employee. Furthermore, the policy specifically lists separate categories of conduct that will result in "*Automatic Termination*," including destruction of property, fighting, theft, and falsification of records, among others.[1] (Id.) (emphasis in original). Finally, Daniel Righetti, the Secretary/Treasurer of Local 262, and Gabrielle Gillespie, a former supervisor at the Facility, testified about instances where L'Oreal chose not to terminate an employee that had accumulated eighteen or more points over a twelve month period due to exceptional circumstances. Those instances are discussed in detail below.

On September 28, 2009, Ms. Arenas filed a Complaint in New Jersey Superior Court, Middlesex County alleging that her termination constituted age discrimination in violation of the

---

[1] Quality errors are not listed as a ground for automatic termination.

5

NJLAD, and seeking compensatory and punitive damages. On February 17, 2010, L'Oreal removed this case to this Court pursuant to its diversity jurisdiction under 28 U.S.C. § 1332. On August 8, 2010, Ms. Arenas filed an Amended Complaint to add certain factual allegations in support of her claim. Specifically, the Amended Complaint alleges that after refusing to accept the VERP, "L'Oreal embarked on a campaign to terminate Ms. Arenas solely based on her age." (Amend. Compl. ¶ 16.) To support this allegation, she contends that she was singled out in being issued quality error points for the two March 19, 2009 incidents. With respect to the first incident, she maintains that she "merely took over production from the prior shift workers and ran the products as she was told to do so," (Amend. Compl. ¶ 15), and that "the operators who ran in the line in the prior shift were issued only two (2) disciplinary points each for the same error, while Ms. Arenas was issued six (6) points." (Id.). With respect to the second incident, she maintains that "the operators who took over production after her were never disciplined for continuing to print the wrong labels." (Id.).

## II. DISCUSSION

L'Oreal now moves for summary judgment against Ms. Arenas' NJLAD claim pursuant to Federal Rule of Civil Procedure 56(c). In doing so, it argues that (1) Ms. Arenas has failed to make a prima facie showing of age discrimination under the NJLAD, and (2) even if she had made a prima facie showing of age discrimination, she is unable to show that L'Oreal's non-discriminatory reason for termination was a pretext for discrimination. Ms. Arenas argues that (1) she has made a prima facie showing of age discrimination, and (2) there is significant evidence in the record from which a jury could infer that L'Oreal's non-discriminatory reason for her termination was pretextual.

**A. Standard of Review**

Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). For an issue to be genuine, there must be "a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party." Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006). For a fact to be material, it must have the ability to "affect the outcome of the suit under governing law." Id. Disputes over irrelevant or unnecessary facts will not preclude granting summary judgment.

The party moving for summary judgment has the burden of showing that no genuine dispute of material fact exists. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). When the moving party does not bear the burden of proof at trial, it may discharge its burden under the summary judgment standard by showing that there is an absence of evidence to support the non-moving party's case. Id. at 325. If the moving party can make such a showing, then the burden shifts to the non-moving party to present evidence that a genuine factual dispute exists and a trial is necessary. Id. at 324. In meeting its burden, the non-moving party must offer specific facts that establish a material dispute, not simply create "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). In deciding whether a dispute of material fact exists, the Court must consider all facts and their reasonable inferences in the light most favorable to the non-moving party. See Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The Court's function, however, is not to weigh the evidence and rule on the truth of the matter, but rather to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If there are no issues that require a trial, then judgment as a matter of law is appropriate. Id. at 251-52.

**B. Ms. Arenas' Claim under the NJLAD**

The NJLAD provides, in pertinent part, that it is unlawful "[f]or an employer, because of the . . . age . . . of any individual . . . to discharge or require to retire, unless justified by lawful considerations other than age, from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment . . ." N.J.S.A. 10:5-12.

To make a prima facie case of age discrimination under the NJLAD, Ms. Arenas must show that age played a role in the decision making process to terminate her employment and that "it had a determinative influence on the outcome of that process." Bergen Comm. Bank v. Sisler, 157 N.J. 188, 207 (1999) (quotations and citations omitted). She can do so by either direct or circumstantial evidence. Id. at 208.

Direct evidence of wrongful discharge under the statute would indicate that "decisionmakers [at L'Oreal] placed substantial reliance on an illegitimate criterion"—in this case, Ms. Arenas' age—in deciding to terminate her employment. Id. Such evidence must "demonstrate not only a hostility toward [older employees], but also a direct causal connection between that hostility" and Ms. Arenas' termination. Id. If Ms. Arenas "is able to satisfy this rigorous burden and establish a direct prima facie case that age, per se, was a substantial factor in an adverse employment decision, the burden the shifts to [L'Oreal] to show that it would have made the same decision even in the absence of the impermissible criterion." Id.

In contrast, circumstantial evidence of wrongful discharge under the NJLAD is demonstrated through the familiar analytical framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 (1973). Sisler, 157 N.J. at 209. The McDonnell Douglas analysis proceeds in three stages. As applicable here, Ms. Arenas must first establish a prima facie case of discrimination under the NJLAD. McDonnell Douglas, 411 U.S. at 802. If she succeeds in

establishing a prima facie case, the burden shifts to L'Oreal "to articulate some legitimate, nondiscriminatory reason for" Ms. Arenas' termination. Id. If L'Oreal meets this burden, Ms. Arenas must then prove by a preponderance of the evidence that the legitimate reasons offered by L'Oreal are merely a pretext for discrimination. Id. at 804-05.

Here, the allegations of age discrimination in the Amended Complaint are entirely circumstantial. Therefore, the McDonnell Douglas framework applies.

### i.   *Ms. Arenas' Prima Facie Case*

Under that framework, to establish a prima facie case of unlawful termination under the NJLAD in the context of age discrimination, Ms. Arenas must demonstrate (1) that she belongs to a protected class, (2) that she was qualified for the position held, (3) that she was terminated despite adequate qualifications, and (4) a logical basis on which to find that L'Oreal's decision to terminate her was affected significantly by her age. Young v. Hobart West Grp., 385 N.J. Super. 448, 459 (App. Div. 2005); Petrusky v. Maxfli Dunlop Sports Corp., 342 N.J. Super. 77, 82 (App. Div.) certif. denied, 170 N.J. 388, (2001).

The parties do not dispute that Ms. Arenas has met the first three elements of a prima facie case; however, they hotly dispute the nature of the fourth. Citing to Monaco v. Am. Gen. Assur. Co., 359 F.3d 296 (3d Cir. 2004), L'Oreal argues that the fourth element can be met only by showing that Ms. Arenas was "'replaced' by someone significantly younger." (Def.'s Br. Summ. J. 14.) Ms. Arenas argues that she need not show that she was replaced by someone sufficiently younger, but can instead set forth "other proof that the discharge was because of age." (Pl.'s Br. Summ. J. 4.) (quotations and citations omitted). The Court agrees with Ms. Arenas.

To be sure, the Monaco court interpreted New Jersey state law and found that the fourth element of a prima facie case of unlawful termination under the NJLAD in the context of age discrimination "requires a showing that the plaintiff was replaced with a 'candidate sufficiently younger to permit an inference of age discrimination.'" Monaco, 359 F.3d at 303. However, Monaco was a case where a plaintiff claimed age discrimination in being laid off as part of a workforce reduction. Id. at 297. As a result, the court analyzed the plaintiff's prima facie case under the standard applicable to "a reduction-in-force case brought under the ADEA." Id. at 305. That is, instead of requiring the plaintiff to show that he was replaced with someone sufficiently younger to give rise to an inference of age discrimination, the court required a showing "that the employer retained someone similarly situated to [the employee] who was sufficiently younger." Id. Therefore, the court's finding that a prima facie case of unlawful termination (that is not a layoff) in the context of age discrimination under the NJLAD requires a plaintiff to show that he or she was replaced by a sufficiently younger person is dicta.

As a result, the issue of whether a prima facie case of unlawful termination under the NJLAD in the context of age discrimination requires a showing of replacement with a younger employee is determined by the opinions of the New Jersey Supreme Court. Gares v. Willingboro Twp., 90 F.3d 720, 725 (3d Cir. 1996). However, in the absence of clear guidance from that court, this Court may consider the decisions of New Jersey's intermediate appellate courts "for assistance in predicting how the state's highest court would rule." Id.

The Monaco court relied heavily on the New Jersey Supreme Court's opinion in Sisler. Sisler was a case of reverse age discrimination where it was held that the protections of the NJLAD extend to employees that are discharged on account of their youth, in addition to those discharged on account of their old age. 157 N.J. at 214. In reaching this holding, the court

rejected the notion that a claim of age discrimination can arise only when a plaintiff that is a member of the protected class of those age forty and older is replaced by someone outside that class. Id. at 212-13. In doing so, it acknowledged that lower courts have held that a prima facie case of age discrimination under the NJLAD does not require a plaintiff to show that he or she was replaced by someone under the age of forty; rather "a showing that the plaintiff was replaced with a candidate sufficiently younger to permit an inference of age discrimination" is sufficient. 157 N.J. at 213. However, the court did not actually hold that the fourth element of a prima facie case of unlawful discharge under the NJLAD in the context of age discrimination requires that a plaintiff be replaced by a younger person.

Indeed, the court specifically rejected a "mechanistic application" of the fourth element of a prima facie case. Id. ("The fourth element of a *prima facie* case in an age-discrimination case properly focuses not on whether the replacement is a member of the protected class but on whether the plaintiff has established a logical reason to believe that the decision rests on a legally forbidden ground." (quotations and citations omitted)). Moreover, the court noted that it has "not hesitated to depart from the McDonnell Douglas methodology if a rigid application of its standards is inappropriate under the circumstances." Id. at 212 (citing Grigoletti v. Ortho Pharmaceutical Corp., 118 N.J. 89, 107 (1990)).

Here, such a rigid application would be inappropriate under the circumstances. Ms. Arenas was terminated on the basis of her performance, not as part of a workforce reduction effort. Therefore, she could not meet the fourth element of a prima facie case by showing that L'Oreal retained similarly situated employees that were younger. See Monaco, 359 F.3d at 305. At the same time, she would be unable to satisfy that element because there is no evidence that she was replaced. Nonetheless, she presents a logical basis on which to find that L'Oreal's

decision to terminate her employment was affected by her age, namely her refusal to accept the VERP resulted in unequal discipline, and, ultimately, her termination. However, under the Monaco court's interpretation of New Jersey state law, plaintiffs in Ms. Arenas' position would be unable to establish a prima facie case of age discrimination under the NJLAD. Employers should not be able to circumvent the statute by terminating employees under the guise of poor performance as a means to achieve a workforce reduction.

Consistent with the Court's interpretation of Sisler are subsequent Appellate Division decisions holding that, in establishing the fourth element of a prima facie case age discrimination under the NJLAD, "[t]he focal question is not necessarily how old young the claimant or [her] replacement was, but rather whether the claimant's age, in any significant way, 'made a difference' in the treatment [she] was accorded by [her] employer." Young v. Hobart West Grp., 385 N.J. Super. 448, 459 (App. Div. 2005); Petrusky v. Maxfli Dunlop Sports Corp., 342 N.J. Super. 77, 82 (App. Div.) certif. denied, 170 N.J. 388, (2001). Therefore, the Court is confident that the New Jersey Supreme Court would not mandate that a plaintiff be replaced by a younger person in order meet the fourth element of a prima facie case of age discrimination under the NJLAD, but instead require a logical basis on which to find that a plaintiff's termination was significantly affected by his or her age. Under this more flexible standard, Ms. Arenas has made a prima facie case under the NJLAD.[2]

---

[2] The Monaco court voiced its concern that applying the more flexible standard set forth by the Petrusky court would "lead to an absurd result . . . [because] practically every terminated employee would be able to establish a prima facie case of age discrimination." 359 F.3d at 304. However, that standard does not merge the first and fourth elements of a prima facie case. The fourth element requires a logical basis, beyond the mere fact of plaintiff's age (the first element), on which to find that his or her termination was significantly affected by his or her age. Indeed, in prior decisions, the Court of Appeals has made clear that the mere fact that an employee was superannuated at the time of his or her termination is not enough to make a prima facie case of age discrimination under the McDonnell Douglas analysis. See e.g., Maxfield v. Sinclair Int'l., 766 F.2d 788, 792 (3d Cir. 1986) ("[T]he fourth element of the McDonnell Douglas test could be

### ii. *L'Oreal's Non-Discriminatory Reason*

Because Ms. Arenas has established a prima facie case of age discrimination, the burden shifts to L'Oreal to articulate a legitimate, non-discriminatory reason for Ms. Arenas' termination. See McDonnell Douglas, 411 U.S. at 802. L'Oreal maintains that Ms. Arenas was not terminated as a result of her age, but instead "was discharged in accordance with L'Oreal's discipline policy because she had accumulated excessive quality error points." (Def.'s Br. Summ. J. 16.) As a result, the burden shifts back to Ms. Arenas to show that L'Oreal's stated reason is a pretext to discriminate against her. See McDonnell Douglas, 411 U.S. at 804-05.

### iii. *Pretext*

To meet this burden, Ms. Arenas must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably (1) "disbelieve [L'Oreal's] articulated legitimate reason; or (2) believe that [her age] . . . was more likely than not a motivating or determinative cause of [her termination]." Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994). In other words, "to avoid summary judgment [Ms. Arenas'] evidence rebutting [L'Oreal's] proffered legitimate reason[] must allow a factfinder reasonably to infer that . . . [it] was either a *post hoc* fabrication or otherwise did not actually motivate the employment action." Id.

"To discredit [L'Oreal's] proffered reason, however, [Ms. Arenas] cannot simply show that [its] decision was wrong or mistaken." Id. at 765. "Rather, [she] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [L'Oreal's] proffered legitimate reason[] for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that L'Oreal did not act for [its asserted] non-discriminatory reason[]." Id. (quotations and citations omitted).

---

satisfied by proof of either replacement by someone outside the protected class or by someone younger or by other proof that the discharge was because of age.") cert. denied sub nom. Sinclair Int'l v. Maxfield, 474 U.S. 1057 (1986).

13

Ms. Arenas offers as circumstantial evidence of pretext that, over the course of her thirty year tenure at the facility, she had a nearly impeccable disciplinary record, and then, "all of a sudden in 2009, she purportedly accumulated excessive quality error points necessitating her discharge." (Pl.'s Br. Summ. J. 9) (quotations and emphasis omitted). In other words, as Ms. Arenas contends, "it is no mere coincidence that after 30 years of excellent service, [she] suddenly became an allegedly poor performer just at the same time that L'Oreal was unsuccessful in getting rid of her through the VERP retirement package." (Pl.'s Br. Summ. J. 12) (emphasis omitted).

To support this contention, she alleges that (1) L'Oreal was looking to get rid of its older employees at the Facility by offering them the VERP, and (2) her accumulation of disciplinary points and ultimate termination occurred soon after refusing to accept the VERP.

Ms. Arenas further alleges "numerous material inconsistencies and contradictions in [L'Oreal's] articulated justification for its conduct." (Id.). Specifically, she alleges that (1) other employees at the Facility had garnered eighteen or more points yet were not terminated, and (2) the issuance of disciplinary points for quality errors was inconsistent. To support these allegations, she points to the testimony of Mr. Righetti and Ms. Gillespie regarding instances where employees that had garnered eighteen or more points were not terminated, as well as the aforementioned testimony of Mr. Gil and Mr. Reed regarding instances where employees that made quality errors would not receive points. On that basis, she suggests that a jury could infer that Ms. Arenas was singled out by L'Oreal after refusing the VERP because she always received points for her errors, and was terminated on the basis of accumulating more than eighteen points.

L'Oreal counters that Ms. Arenas' allegations "are nothing more than unsupported accusations, feelings and beliefs." (Def.'s Br. Summ. J. 18.) The company maintains that Ms. Arenas' allegation that "L'Oreal offered the VERP as part of a grand scheme to rid itself of its older workforce" is purely speculative and not supported by the record. (Def.'s Reply Br. Summ. J. 7.) It contends that Ms. Arenas received points for her errors not because of her age, but in accordance with the Discipline Policy because she, in fact, committed those errors. L'Oreal further contends that there is no evidence in the record indicating that Ms. Arenas was treated differently than any other employee at the Facility.

The record fails to cast any doubt on L'Oreal's legitimate non-discriminatory reason for terminating Ms. Arenas in accordance with the Discipline Policy. While the VERP was intended to reduce the overall workforce at the Facility, there is no evidence that it was intended to rid the Facility of its older workforce. Mr. Righetti, testified that the VERP was offered not as a means to shed older employees but rather to avoid layoffs at the Facility as a result of a bad economy and declining production by offering employees that were nearing retirement the chance to do so early. See (Certification of Laura A. Stutz in Support of Defendant's Motion for Summary Judgment, dated January 20, 2011 ("Stutz Cert."), Ex. I.) He further testified that, in the event of a workforce reduction, those employees with the lowest level of seniority had the highest risk of being laid off, while those with highest maintained the least risk. See (id.). As a result, having worked at the Facility for nearly thirty years, the risk that Ms. Arenas would have been laid off was extremely slim.

In addition, the instances where other employees at the Facility were not terminated despite having accumulated eighteen or more points fail to cast doubt on L'Oreal's legitimate, non-discriminatory reason. Mr. Righetti testified regarding an instance where an employee had

accumulated eighteen and a half points. See (Zatuchni Cert., Ex. G.) One or two weeks later, one of those points expired and L'Oreal opted not to terminate him because, at that time, he was one-half of a point shy of termination. See (id.). Shortly thereafter, however, the employee received additional points and was terminated. See (id.).

Mr. Righetti also testified about an instance where an employee that had accumulated eighteen or nineteen points was not terminated because the employee knew how to perform a certain mechanical procedure at the Facility that virtually no other employee at the time could perform. See (id.). In other words, despite his accumulation of excessive points, L'Oreal felt that it could not effectively run the Facility without him.

Ms. Gillespie testified about an instance where a group of employees had accumulated excessive points but were not terminated because L'Oreal's computer system initially failed to correctly tabulate the group's points. See (Zatuchni Cert., Ex. F.) As a result, those employees retained their excessive points but were subject to termination upon accumulating additional points. See (id.)

Finally, Ms. Gillespie testified about an employee that had accumulated eighteen points but was not terminated because, upon investigation of the circumstances under which he received those points, L'Oreal discovered that he had undergone multiple oral surgeries. See (id.). Because L'Oreal believed that it had a legal obligation to obtain further information about the surgeries from the employee's physician before terminating him, he maintained his eighteen points, but was not terminated. See (id.).

None of these instances suggests that L'Oreal rendered its decision to terminate Ms. Arenas differently than that of any other employee. Indeed, she accumulated twenty-six quality error points between April 3, 2008 and March 19, 2009—far more than required to terminate an

employee under the Discipline Policy. In accordance with the policy, L'Oreal considered the circumstances under which she accumulated those points and decided to terminate her. Therefore, the aforementioned instances fail to cast doubt on L'Oreal's assertion that she was terminated in accordance with the Discipline Policy for having received more than eighteen quality error points or otherwise indicate that she was terminated because of her age.

Ms. Arenas' contention that L'Oreal inconsistently issued points for quality errors similarly fails to cast doubt on the company's legitimate, non-discriminatory reason for her termination. As previously discussed, both Mr. Gil and Mr. Reed testified that employees would, at times, not receive points for smaller quality errors that are caught by the employee during their hourly quality check. See (Zatuchni Cert., Ex. C, D.) However, Ms. Arenas was issued quality error points specifically because she failed to conduct her hourly quality checks, resulting in many thousands of mislabeled or quality rejected units. Therefore, there is no basis on which to doubt that Ms. Arenas was issued quality error points in accordance with the Discipline Policy and the standard practices of supervisors at the Facility.

### III. CONCLUSION

For the foregoing reasons, L'Oreal's Motion for Summary Judgment is GRANTED. Ms. Arenas' Amended Complaint is dismissed in its entirety with prejudice.

The Court will enter an order implementing this opinion.

*[signature]*
DICKINSON R. DEBEVOISE, U.S.S.D.J.

Dated: May 13, 2011